**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| ARMORED REPUBLIC HOLDINGS, LLC, d/b/a ARMORED REPUBLIC, an Arizona limited liability company, | ) ) ) ) | CASE NO. _____ |
| **Plaintiff,** | ) ) |  |
| **v.** | ) ) ) |  |
| WALTER MOSLEY, in his official capacity as the New York Secretary of State; STEVEN JAMES, in his official capacity as acting Superintendent of the New York State Police; ANNE DONNELLY, in her official capacity as Nassau County District Attorney; and MELINDA KATZ, in her official capacity as Queens County District Attorney, | ) ) ) ) ) ) ) ) ) ) |  |
| **Defendants.** | ) ) |  |
| _____ | ) |  |

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

The Plaintiff, Armored Republic Holdings, LLC, d/b/a Armored Republic, alleges as follows for its Complaint against the Defendants named herein:

**INTRODUCTION**

1.     This action is a facial Second Amendment challenge to the State of New York's statutes and regulations[1] banning the sale, purchase, acquisition, and transfer of body armor to or by persons who are not in certain "eligible professions." *See* New York Department of State, *Body Armor*, available at: https://dos.ny.gov/body-armor.

---

[1] For purposes of this Complaint, these statutes and regulations will hereinafter be referred to collectively as the "Challenged Regulations." The Challenged Regulations refer to the following New York statutes and regulations: (a) New York State General Business Law §396-eee; (b) New York State Penal Law § 270.21; (c) New York State Penal Law § 270.22; (d) New York State Executive Law § 144-a; and (e) regulations promulgated thereunder by the New York Secretary of State, all of which are codified at 19 NYCRR Chapter XIX, Part 905.

1

2.      The Second Amendment to the U.S. Constitution protects "the right of the *People* to keep and bear *arms*[.]" (emphasis added).

3.      The Second Amendment applies to the State of New York through the Fourteenth Amendment. *See McDonald v. City of Chicago*, 561 U.S. 742 (2010).

4.      The phrase "the People" in the Second Amendment is not limited to select privileged classes of individuals but includes *all* Americans. *See District of Columbia v. Heller*, 554 U.S. 570, 580 (2008) (ruling that "the People" in the Second Amendment "unambiguously refers to *all* members of the political community, not an unspecified subset").

5.      The right to "bear arms" refers to the right to "*wear*, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or *defensive* action in a case of conflict with another person." *Id*., at 584 (emphasis added).

6.      The phrase "keep and bear" in the Second Amendment refers not only to the possession and carry of arms, but also protects the ancillary right to *purchase* and *acquire* arms. *See Gazzola v. Hochul*, 88 F.4th 186, 196 (2d Cir. 2023) (recognizing that a State cannot "ban[] outright the sale or transfer of common-use weapons and necessary ammunition"); *N.Y. State Rifle & Pistol Ass'n v. City of N.Y.*, 883 F.3d 45, 58 (2d Cir. 2018) ("[R]estrictions that limit the ability of firearms owners to acquire and maintain proficiency in the use of their weapons can rise to a level that significantly burdens core Second Amendment protections").

7.      The term "arms" in the Second Amendment includes not only "weapons of offense," but also "*armour* of defence." *Heller*, 554 U.S. at 581 (2008) (emphasis added). It extends not only "any thing a man takes into his hands, or useth in wrath to cast at or strike another," but also to "any thing that a man *wears* for his *defence*[.]" *Id*. (emphasis added).

8.     "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all *instruments* that constitute *bearable arms*, even those that were not in existence at the time of the founding. Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern *instruments that facilitate armed self-defense." N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 28 (2022) (emphasis added) (internal quotations and citations omitted).

9.     The Second Amendment requires that any regulation on the acquisition of arms be consistent with the America's historical tradition of arms regulation: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Bruen*, 597 U.S. at 24 (2022) (internal citations and quotations omitted).

10.     Because all law-abiding New York citizens are part of "the People," because the right to "keep and bear" arms includes the right to *purchase* and *acquire* them, and because articles of body armor are "arms," the acquisition of body armor by law-abiding New York citizens is conduct that implicates the plain text of the Second Amendment and is therefore presumptively protected pursuant to *Bruen*.

11.     The Challenged Regulations infringe on the rights of New York citizens to keep and bear body armor by prohibiting all but a select few from lawfully acquiring body armor.

12.     Under the framework set forth in *Bruen*, the Defendants in this case must meet their burden of showing that the Challenged Regulations are consistent with America's historical

tradition of arms regulation. Specifically, this burden requires that the Defendants "identify an American tradition" of arms regulation "justifying" these rules by "identify[ing] a well-established and representative historical analogue" to the Challenged Regulations. *Bruen*, at 38-39. This is a burden that the Defendants cannot meet. Therefore, the Challenged Regulations must be invalidated as unconstitutional infringements on the Second Amendment rights of New Yorkers.

13.     In *Bruen*, the U.S. Supreme Court struck down New York's "proper cause" licensing regime for the carry of firearms under which an applicant could only obtain a license to carry a firearm "only if he can demonstrate a *special need* for self-protection distinguishable from that of the general community." *Id*., at 12. The *Bruen* Court invalidated New York's "special need" regime, concluding that there is no "historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense." *Id*., at 38.

14.     The Challenged Regulations in this case are *worse* than the "special need" regime that was invalidated in *Bruen*. Whereas New York's pre-*Bruen* "special need" regime for firearm carry licenses was based on an individualized determination for each applicant as a person, the Challenged Regulations bar *anyone* from acquiring body armor unless they are "engaged or employed in an eligible profession," which in the determination of the New York Department of State has "duties [that] may expose the individual to serious physical injury that may be prevented or mitigated by the wearing of body armor." N.Y. Exec. § 144-a. This is a "special need" requirement to acquire body armor, but one that is based on the "need" of an entire generalized profession rather than the "need" of an individual. It is therefore more constitutionally repugnant than that which was invalidated in *Bruen*.

4

15.     As the Supreme Court explained in *Bruen*, the right to keep and bear arms is not one "that an individual may exercise only after demonstrating to government officers some special need." 597 U.S. at 70.

16.     "[T]he inherent right of self-defense has been central to the Second Amendment right." *Heller*, at 628. Like the District of Columbia's handgun ban that was struck down in *Heller*, New York's body armor ban under the Challenged Regulations "amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose." *Id*.

## PARTIES

17.     Plaintiff Armored Republic Holdings, LLC, d/b/a Armored Republic is and was at all times relevant an Arizona limited liability company having its principal place of business in Phoenix, Arizona.

18.     Defendant Walter T. Mosley ("Mosley") is the New York Secretary of State. As such, under the Challenged Regulations, he is responsible for promulgating rules and regulations to establish criteria for "eligible professions" who may lawfully acquire body armor. *See* N.Y. Exec. § 144-a. As head of the New York Department of State, he is responsible for maintaining a list of "eligible professions" and for making determinations as to which professions meet the criteria for being "eligible professions" under the Challenged Regulations. *See* 19 NYCRR §§ 905.1 - 905.7. Defendant Mosley has violated the constitutional rights of Plaintiff's customers and prospective customers by promulgating regulations that infringe on their ability to acquire body armor. He is sued in his official capacity. Defendant Mosley may be issued summons and served with process at One Commerce Plaza, 99 Washington Ave, Albany, NY 12231.

19.     Defendant Steven James ("James") is the current acting Superintendent of the New York State Police. By virtue of that office, Defendant James' duties require and empower him "to prevent and detect crime and apprehend criminals [. . .] to arrest, without a warrant, any person committing or attempting to commit within [his] presence or view a breach of the peace or other violation of law, to serve and execute warrants of arrest or search issued by proper authority and to exercise all other powers of [a] police officer[] of the state of New York." N.Y. Exec § 223(1). His powers and duties under New York law include making arrests and executing warrants for violations and suspected violations of the Challenged Regulations. He is sued in his official capacity. Defendant James may be issued summons and served process at the New York State Police, Building 22, 1220 Washington Avenue, Albany, NY, 12226.

20.     Defendant Anne Donnelly ("Donnelly") is the current District Attorney for Nassau County, New York. By virtue of that office, she has the power and discretion to prosecute crimes in Nassau County, including violations of the Challenged Regulations. *See Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988) ("It is well established in New York that the district attorney, and the district attorney alone, should decide when and in what manner to prosecute a suspected offender"). She is sued in her official capacity. Defendant Donnelly may be issued summons and served process at 262 Old Country Road, Mineola, NY 11501.

21.     Defendant Melinda Katz ("Katz") is the current District Attorney for Queens County, New York. By virtue of that office, she has the power and discretion to prosecute crimes in Queens County, including violations of the Challenged Regulations. She is sued in her official capacity. Defendant Katz may be issued summons and served process at 125-01 Queens Boulevard, Kew Gardens, New York 11415.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it arises under the Constitution of the United States. The Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 since this action seeks to redress the deprivation, under color of the laws, ordinances, regulations, customs and usages of the State, of rights, privileges or immunities secured by the United States.

23.     This Court has personal jurisdiction over all of the Defendants in this case because they are public officials of the State of New York who are domiciled in New York.

24.     Venue is appropriate in this Court under 28 U.S.C. § 1391, because the events giving rise to Plaintiffs' cause of action arose or exist in this District and because one or more of the Defendants reside in this District.

## JUSTICIABILITY OF CLAIMS

25.     Plaintiff has derivative standing to assert a claim under the Second and Fourteenth Amendments on behalf of their New York customers and prospective customers. *See Gazzola*, 88 F.4th at 195 ("We therefore hold that [arms sellers] have derivative standing to pursue Second Amendment claims on behalf of their customer base").

26.     With respect to the New York regulations at issue in this action: (1) Plaintiff's New York customers and prospective customers have suffered an injury in fact that is concrete and particularized and that is actual or imminent; (2) there is a sufficient causal connection between their injury and the Challenged Regulations; and (3) there is a likelihood that their injury will be redressed by a favorable decision in this case. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014).

27.     As set forth herein, the regulations at issue do not permit any administrative relief or remedy for Plaintiff in this case. Therefore, there are no exhaustible administrative remedies and the claims asserted herein are ripe for adjudication.

28.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, respectively, and their claim for attorneys' fees is authorized by 42 U.S.C. § 1988.

## GENERAL ALLEGATIONS

### *The Legal History of Armor*

29.     In Anglo-American jurisprudence, the term "arms" has long been understood as being inclusive of armor. In 1181, as an effort to revive the ancient Anglo-Saxon *fyrd* militia system, King Henry II of England issued the first Assize of Arms, a proclamation requiring "every free layman" to have, depending on his chattels, either "a shirt of mail, a helmet, a shield, and a lance," or "a hauberk, an iron cap, and a lance," and referring to all of these items, both weapons and armor, as "arms." *The Assize of Arms (1181), reprinted in Sources of English Constitutional History* 85-87 (Carl Stephenson & Frederick George Marcham, eds., 1937).

30.     The 1285 Statute of Winchester, which "commanded that every man have in his house *arms* for keeping the peace," specified that the "arms" which a man was required to have included a "hauberk" (a type of chainmail shirt that covers the torso and reaches down to the thighs), a "haubergeon" (a shorter version of a hauberk, typically reaching only to the waist or hips), and a "helmet of iron," all three of which were articles of armor rather than weapons. *See* 13 Edw. 1. St. 2 (1285), *reprinted in Sources of English Constitutional History*, supra, at 174.

31.     The 1328 Statute of Northampton, 13 Edw. 1, 102, which applied to every Englishman "great [or] small, of what Condition soever he be," and which the *Bruen* Court

recognized as having "been centrally concerned with the wearing of armor," (597 U.S. at 40-41) demonstrates not only that armor was within the meaning of "arms," but also that armor was possessed by all classes and professions of persons. In its discussion of this statute, the *Bruen* Court described both weapons and armor as "arms." *Id*. ("The Statute's apparent focus [was] on armor and, perhaps, weapons like launcegays . . . Contrast these *arms* with daggers").

32.     King Henry VIII reissued the Statute of Winchester in 1511, ordering "that every man have in his house armour for kepyng of the peace according to his havyour and substaunce, as they have been and shal be ordred by the commyssioners a ter the olde assise." *See* John Jeremy Goring, *The Military Obligations of the English People 1511-1558* (1955).

33.     The legal recognition of armor as commonly possessed arms crossed the Atlantic into the British colonies, as evidenced by Colonial enactments and state statutes in existence leading up to the ratification of the Second Amendment in 1791.

34.     In 1606, King James I of England granted a charter to the Virginia Company for the creation of a settlement. *See The First Charter of Virginia; April 10, 1606*, The Avalon Project: Documents in Law, History and Diplomacy, accessible at https://avalon.law.yale.edu/17th_century/va01.asp. Among the perpetual rights granted in the Charter to the Virginia colonists was the right to acquire "*Armour*, Weapons, Ordinance, Powder [. . .] and all other things necessary for [. . .] their Use and Defence[.] *Id*. (emphasis added).

35.     A 1680 New York law forbad the sale of "any *armor* or weapons" to "Indians." *See The Colonial Laws Of New York From The Year 1664 To The Revolution, Including The Charters To The Duke Of York, The Commissions And Instructions To Colonial Governors, The Dukes Laws, The Laws Of The Dongan And Leisler Assemblies, The Charters Of Albany And New York And The Acts Of The Colonial Legislatures From 1691 To 1775*, pp 40-41 (1896)

(emphasis added). While it should go without saying that such race-based exclusions would be unconstitutional today, during this time, Native Americans "were thought to pose more immediate threats to public safety and stability and were disarmed as a matter of course." *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting). Nevertheless, the fact that this law was enacted implies that armor was commonly owned by colonists in New York and was able to be lawfully sold to persons who were not regarded as dangerous.

36.     A 1756 Maryland statute prohibited Roman Catholics from possessing armor. It also forbad *other persons* from providing their armor for use by a Roman Catholic on penalty of forfeiture of their armor. *See Votes and Proceedings of the Lower House of Assembly of the Province of Maryland, February Session, 1756* (Annapolis, MD: Jonas Green, 1757), 95. While such religious discrimination would be unconstitutional today, Roman Catholics as a religious minority were perceived at the time to be dangerous in an overwhelmingly Protestant Colonial society. *See Kanter*, 919 F.3d at 457 (Barrett, J., dissenting); C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 723 (2009). Nevertheless, this statute demonstrates a legal recognition of lawful armor possession in mid-Eighteenth-Century Colonial America by individuals who were not regarded as dangerous.

37.     A 1783 Connecticut statute made it a capital crime to commit robbery while being "*armed* with any dangerous *Armour* or Weapon[.]" 1783 Conn. Acts 633, *An Act For The Punishment of Burglary And Robbery* (emphasis added). This statutory language demonstrates that in the same year the Treaty of Paris ended the Revolutionary War, the term "arms" was understood as encompassing armor.

38.     In 1786, just one year before the Constitutional Convention in Philadelphia, the Virginia General Assembly enacted an affray statute that employed much of the same verbiage

10

from the 1328 Statute of Northampton. *See* 1786 Va. Acts 35. (Ch. 49, An Act Forbidding and Punishing Affrays). Like the Statute of Northampton, this act provided that "no man, great nor small, of what condition soever he be" could come before certain public officials "with force and arms, [. . .] nor go nor ride armed by night nor by day, in fair or markets, or in other places, in terror of the county[.]" *Id*. The penalties for a man's violation of this statute included "forfeit[ure of] his armour to the Commonwealth." *Id*. Like the Statute of Northampton, this statute's broad application to all classes and conditions of persons together with the penalty of forfeiture of armor[2] implies a legislative recognition of the lawfulness of peaceably possessing body armor by citizens in all sectors of society.

39.     The foregoing statutes demonstrate that at the time of the ratification of the Second Amendment in 1791, the term "arms" had a centuries-long legal history as being understood to include both weapons and armor. As recognized by the U.S. Supreme Court in *Heller*, the word "arms" also had an accepted public meaning that included armor, as demonstrated by English dictionaries contemporary with the ratification. *See* 554 U.S. at 581.

40.     The foregoing statutes also demonstrate an implicit legislative recognition that body armor was lawfully acquired and owned by law-abiding persons of all social stations who were not in a suspect category of persons regarded as especially dangerous or as being outside the political community (e.g., Roman Catholics and Native Americans).

41.     No law in American history leading up to the ratification of the Second Amendment in 1791 prohibited the acquisition of body armor by persons based on their profession or restricted the lawful acquisition of armor to select professions.

---

[2] Sir William Blackstone, who the U.S. Supreme Court has called "the preeminent authority on English law for the founding generation," (*Alden v. Maine*, 527 U.S. 706, 715 (1999)) characterized this penalty — the forfeiture of *armor* — as a "forfeiture of the *arms*." William Blackstone, *Commentaries on the Laws of England*, Book the Fourth 148-49 (1765-1769) (emphasis added).

42.     Body armor was in common use in late Eighteenth-Century America. Militia mandates in New York, North Carolina, Rhode Island, and Virginia required citizens to keep various kinds of armor for use in the cavalry as late as 1798. *See* Greenlee, Joseph, *The Tradition of Armor Use and Regulation in America* (December 30, 2023), at pp. 28-29, available at SSRN: https://ssrn.com/abstract=4679833 (citing to relevant militia mandates for armor items in each colony/state). Body armor was used by soldiers and officers during both the French and Indian War (1754-1753) and the Revolutionary War (1774-1783). *See Id*, at pp. 29-34.

43.     Body armor continued to be used by Americans throughout the Nineteenth Century. By the 1860s, bulletproof vests were purchasable by the general public and were used by both Union and Confederate soldiers during the American Civil War. *See Id*, at pp. 34-38; Bashford Dean*, Helmets and Body Armor in Modern Warfare* (1920), at pp. 56-58.

44.     At the time of the Ratification of the Fourteenth Amendment in 1868, the term "arms" was still understood as encompassing both offensive weapons and defensive armor. *See* John Bouvier, *A Law Dictionary Adapted to the Constitution and Laws of the United States of America*, 10th ed. 1860, Vol. I, p. 120 (defining "arms" as "Any thing that a man *wears* for his *defense*, or takes in his hands, or uses in his anger, to cast at or strike another").

45.     Between the ratification of the Second Amendment in 1791 and the ratification of the Fourteenth Amendment in 1868, no American legislative body enacted any regulations on the possession, transfer, or acquisition of body armor. *See* David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. LEGIS. (forthcoming 2024), available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4393197.  ("No armor restrictions existed in America [before 1900]").

46.     In the Twentieth and Twenty-First Centuries, several States and the federal government enacted statutes forbidding the use of body armor in the commission of crimes and the possession of body armor by violent felons. However, no laws existed in American history that prohibited law-abiding American citizens from acquiring body armor or restricting the ability to acquire body armor to select professions; that is, until July of 2022 when the State of New York enacted the Challenged Regulations.

***Modern Body Armor in the United States***

47.     Today, there are a variety of body armor products available to Americans for lawful civilian use. These products include hard armor plates, plate carrier vests, soft body armor, trauma pads, fragmentation wraps, armored backpacks, and ballistic helmets (collectively, "Body Armor Products").

48.     Hard armor plates are plates made from steel alloy, ceramic, polyethylene, or a combination of those materials, that are inserted into a plate carrier vest or otherwise worn over the front, back, and/or sides of a person's chest and/or torso to protect the wearer against gunfire, shrapnel, and other projectiles. Exemplary photographs of hard armor plates sold by Plaintiff are attached hereto as **Exhibit 1**.

49.     Plate carrier vests are vests worn over a person's chest and/or torso and which feature one or more compartments to hold hard armor plates or soft armor inserts to cover the front, back, and/or sides of a person's chest and/or torso area for the purpose of protecting against gunfire, shrapnel, and other projectiles. Plate carrier vests by themselves do not provide ballistic protection but are intended to provide such protection when coupled with hard armor plates or soft armor inserts. Plate carrier vests may be sold separately from hard armor plates and/or soft armor inserts, sold in a bundle along with such plates or inserts, or sold with such

plates or inserts integrated into the vest. Exemplary photographs of plate carrier vests sold by Plaintiff are attached hereto as **Exhibit 2**.

50.     Soft body armor refers to body armor made from soft and pliable high-strength aramid fiber materials such as Kevlar. Soft body armor generally provides less protection than hard body armor but is generally much lighter and more flexible. Soft body armor can take the form of concealable vests to be worn under clothing, external vests with integrated soft armor pieces, or inserts to be placed in plate carrier vests or in backpacks. As with hard armor plates, soft body armor is designed to protect the wearer against gunfire, shrapnel, and other projectiles. Exemplary photographs of soft body armor sold by Plaintiff are attached hereto as **Exhibit 3**.

51.     Trauma pad refers to a soft, often non-Newtonian, material pad that is inserted in a plate carrier vest between a hard armor plate and the face of the wearer's body. The purpose of a trauma pad is to protect the wearer against gunfire, shrapnel, and other projectiles by mitigating back-face deformation of the hard armor plate upon impact and reducing the amount of force transferred to the wearer. Exemplary photographs of trauma pads sold by Plaintiff are attached hereto as **Exhibit 4**.

52.     Fragmentation wrap refers to a fitted aramid fiber envelope that is wrapped over a hard armor plate while it is inserted into a plate carrier vest or otherwise worn over a person's chest, sides, and/or torso. The purpose of fragmentation wrap is to protect the wearer against gunfire, shrapnel, and other projectiles by mitigating the otherwise potentially injurious spalling and fragmentation that can result when a hard armor plate is hit by a projectile. Exemplary photographs of fragmentation wraps sold by Plaintiff are attached hereto as **Exhibit 5**.

53.     Armored backpacks are backpacks that include either a hard armor plate or soft armor insert integrated or inserted into the side of the backpack that rests against the back and

shoulders of the individual who wears the backpack. The purpose of an armored backpack is to protect the wearer against gunfire, shrapnel, and other projectiles. Exemplary photographs of armored backpacks sold by Plaintiff are attached hereto as **Exhibit 6**.

54.    Ballistic helmets are helmets worn over the top and/or sides of an individual's head. Ballistic helmets are generally made from hard, ballistic-resistant materials such as metal alloys, polyethylene, ceramic, and/or woven aramid fibers. The purpose of ballistic helmets is to protect the wearer from gunfire, shrapnel, and other projectiles. Exemplary photographs of ballistic helmets sold by Plaintiff are attached hereto as **Exhibit 7**.

55.    According to the National Institute for Justice, "ballistic-resistant body armor can protect against a significant number of types of handgun and rifle ammunition, and stab-resistant body armor can help protect against knives and other sharp weapons." NIJ, *Overview of Body Armor*, available at: https://nij.ojp.gov/topics/articles/overview-body-armor.

56.    The use of body armor among American law enforcement officers is nearly ubiquitous. According to a study produced by the Police Executive Research Forum and the U.S. Department of Justice, Bureau of Justice Assistance, almost all law enforcement agencies (99.4%) nationwide reported that their officers wear body armor when on duty. *See The BJA/PERF Body Armor National Survey: Protecting the Nation's Law Enforcement Officers, Phase II Final Report to BJA, August 9, 2009*, available at https://bja.ojp.gov/sites/g/files/xyckuh186/files/Publications/PERF_BodyArmor.pdf

57.    According to the U.S. Department of Justice, in 2018, there were at least 787,565 sworn, full-time law enforcement officers serving in the United States. *See Bureau of Justic Statistics, Census of State and Local Law Enforcement Agencies, 2018 – Statistical Tables*, accessible at: https://bjs.ojp.gov/library/publications/census-state-and-local-law-enforcement-

agencies-2018-statistical-tables. If only 75% percent of these officers wear body armor (a very conservative number based on the BJA/PERF survey cited above), that translates into at least 590,000 Body Armor Products currently in use just by law enforcement alone.

58.     In addition to the number of body armor products in use by law enforcement, there currently are millions of Body Armor Products in use among American private citizens for civilian purposes.

59.     The overwhelming majority of Body Armor Products are used for lawful purposes such as law enforcement and civilian self-defense.

60.     New York's official website for the Challenged Regulations references mass shootings as the impetus for enacting the Challenged Regulations. *See* NYDOS, *Body Armor*, https://dos.ny.gov/body-armor. However, according to a landmark study published by the Federal Bureau of Investigation, less than 5% of perpetrators in mass-killing incidents from 2000 to 2019 wore body armor. *See* FBI, *Active Shooter Incidents 20-Year Review, 2000-2019*, available at https://www.fbi.gov/file-repository/active-shooter-incidents-20-year-review-2000-2019-060121.pdf/view.

61.     The fact that body armor has been used in a handful of tragic mass-killing incidents does not negate the fact that the overwhelming majority of Body Armor Products are used for lawful purposes, nor does it negate the fact that they are "arms" under the Second Amendment. For example, the same FBI study that found less than 5% of mass-shooters wore body armor also found that nearly 70% of mass-shootings were committed using handguns. *See Id*. Yet handguns are unbannable arms under the Second Amendment despite the fact that they are used in crimes far more frequently than are Body Armor Products. *See Heller*, 554 U.S. 570 (ruling that a handgun ban is unconstitutional); *see also N.Y. State Rifle & Pistol Ass'n v. Cuomo,*

804 F.3d 242, 256 (2d Cir. 2015) ("That evidence of disproportionate criminal use did not prevent the Supreme Court from holding that handguns merited constitutional protection").

62.     The issue of whether an arm is "in common use" is "an objective and largely statistical inquiry[.]" *Cuomo*, 804 F.3d at 257. Courts within this circuit have held that this requirement is met when at least tens of thousands of an item are in use. *See, e.g.*, *Avitabile v. Beach*, 368 F. Supp. 3d 404, 411-12 (N.D.N.Y. 2019) (finding that 300,000 tasers constituted "common use"); *Maloney v. Singas*, 351 F. Supp. 3d 222, 237 (E.D.N.Y. 2018) (finding that "at least 64,890 metal and wood nunchaku" was sufficiently common use).

63.     In *Caetano v. Massachusetts*, 577 U.S. 411 (2016), the U.S. Supreme Court unanimously invalidated a Massachusetts ban on stun guns as violative of the Second Amendment. In a concurring opinion, Justice Alito noted that stun guns were "in common use" because "hundreds of thousands of Tasers and stun guns have been sold to private citizens," and that "[w]hile less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country." *Id*., at 420 (Alito, J., concurring). There are far more Body Armor Products in in use among Americans than there are stun guns. Therefore, *a fortiori*, Body Armor Products are clearly in common use and protected under the Second Amendment.

64.     Defensive armor is typically possessed by law-abiding citizens for lawful purposes of self-defense and personal protection, i.e., to protect themselves from others. To be sure, armor is inherently *defensive*: it merely protects the wearer and has even less offensive ability than the tasers and stun guns ruled to be protected in *Caetano*.

65.     Body Armor Products are "typically possessed by law-abiding citizens for lawful purposes." *Cuomo*, 804 F.3d at 255. In *Cuomo*, the Second Circuit Court of Appeals stated that

17

the analysis for "typical possession" is an inquiry of "whether [an arm] is 'dangerous and unusual' in the hands of law-abiding civilians." *Id*., at 256. The *Cuomo* court found that "reliable empirical evidence of lawful possession for lawful purposes" was "ownership statistics." *Id*., at 257. As the Second Circuit Court of Appeals recently stated, "the Second Amendment protects the right to keep and bear the sorts of weapons that are 'in common use'—a limitation that is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Antonyuk v. Chiumento*, 89 F.4th 271, 295 (2d Cir. 2023).

66.     Body Armor Products are neither dangerous nor unusual. Body armor is strictly a *defensive* item and harms no one. Body armor is the most passive form of self-defense available. Its sole purpose is to act as a safety barrier between one's body and any bullets or projectiles fired at an area covered by it. When used within its design envelope, body armor is a life-saving device.

67.     Body armor is a harmless and innocuous product. Neither the federal government nor any state but New York requires any license, background check, or occupational restrictions on the acquisition of body armor by law-abiding citizens. The U.S. Transportation Security Administration even permits airline passengers to bring body armor onboard flights in carry-on bags. *See* TSA, *Body Armor*, available at: https://www.tsa.gov/travel/security-screening/whatcanibring/items/body-armor.

68.     Any notion that Body Armor Products are dangerous and unusual is contradicted by the fact (demonstrated below) that the Challenged Regulations allow vast numbers of civilians in New York to acquire body armor without any background check so long as they are employed in certain eligible professions such as journalism, newscasting, process serving, school district administration, building safety inspection, animal control, or private investigation.

69.     There are a host of anecdotal examples demonstrating armor's protection of law-abiding citizens. For example, defensive armor is used by private security guards to protect their lives and safety, both on and off the job. *See, e.g.*, David Chang & Dan Stamm, *Off-Duty Security Guard's Bulletproof Vest May Have Saved Life in Shootout*, NBC 10 Philadelphia (Apr. 28, 2022), www.nbcphiladelphia.com/news/local/off-duty-security-guard-thwarts-armed-robbery-at-beer-store/3221530/; Jessica Kwong, *Guard's Body armor stops two bullets*, My San Antonio (Jan. 20, 2012), www.mysanantonio.com/news/local/article/Guard-s-Body-armor-stops-two-bullets-2657088.php; Tim Steele, *Security guard shot in SE Portland, ballistic vest saves him*, Koin 6 (June 27, 2022, 5:37 AM), www.koin.com/news/crime/security-guard-shot-in-se-portland-ballistic-vest-saves-him/ ; Melissa Newman, *Santa Maria security guard thankful for body armor after stabbing*, KSBY 6 (Jan. 14, 2019, 12:31 PM), www.ksby.com/news/local-news/2019/01/13/santa-maria-security-guard-thankful-for-body-armor-after-stabbing.

70.     Defensive armor is used by first responders. *See, e.g.*, Steve Maugeri, *Department updates paramedics' gear to handle active shooter situations*, Spectrum News 1 (June 20, 2022, 7:45 AM), https://spectrumnews1.com/oh/columbus/news/2022/06/09/paramedics--gear-upgraded-to-handle-active-shooter; Max Rodriguez, *Bulletproof vests now part of EMS active threat response*, Khon2 (May 31, 2022, 7:08 AM), www.khon2.com/local-news/bulletproof-vests-now-part-of-ems-active-threat-response/.

71.     Armored backpacks are used by schoolchildren whose parents want to keep them safe from gunfire at school. *See, e.g.*, Shannon Holly, *Kids are Getting Bullet Proof Backpacks in New Jersey*, 94.3 The Point (June 23, 2022), https://943thepoint.com/kids-need-these-bullet-proof-backpacks-in-new-jersey/

*Plaintiff's Body Armor Products*

72.     Plaintiff manufactures and sells various Body Armor Products, including hard armor plates, plate carrier vests, soft body armor, trauma pads, fragmentation wraps, armored backpacks, and ballistic helmets. Plaintiff also sells products that include multiple categories of Body Armor Products packaged together as bundles. *See generally* https://www.ar500armor.com/.

73.     Plaintiff maintains a detailed "Knowledge Base" directory with extensive information on Body Armor Products. See https://www.ar500armor.com/knowledge-base.html.

74.     Plaintiff has been manufacturing and selling Body Armor Products since 2012 and has sold over 2.6 million (2,600,000) Body Armor Products to private Americans, either directly or through dealers. *See* **Exhibit 8**, *Declaration of Matthew McFarland*.

*Body Armor is in common use by law-abiding Americans for lawful purposes*

75.     In addition to Plaintiff, there are at least seventy-three (73) companies that currently sell body armor products to Americans for civilian use. A list of such companies, along with links to their websites, is attached hereto as **Exhibit 9**.

76.     The American public can purchase Body Armor Products on popular online markets such as eBay. *See* https://www.ebay.com/sch/i.html?_nkw=body+armor&_sop=12.

77.     If each of the other 75 known companies selling Body Armor Products to the American public have sold just one percent (1%) of the number of Body Armor Products that Plaintiff has sold, the total aggregate number of their sales would amount to at least an additional 1.9 million (1,900,000) Body Armor Products owned by Americans.

78.     Based on a very conservative estimate, there are at least 4.55 million (4,500,000) Body Products owned by at least private Americans. The actual numbers are likely much higher. This is not inclusive of Body Armor Products sold to governmental agencies.

79.     According to The Violence Project, a nonpartisan nonprofit organization that researches gun violence and maintains extensive statistics on mass-shootings in America, less than thirty (30) mass-shootings in America in the past 40 years have involved a shooter using body armor of any kind. *See* Jaclyn Diaz, *Sales of body armor are on the rise. Who's buying and why?,* National Public Radio, June 14, 2022, available at:

https://www.npr.org/2022/06/14/1103935711/body-armor-sales-increase-rise-mass-shootings-bans.

80.     By any reasonable calculation, the number of Body Armor Products used in mass-shootings accounts for a small fraction of one percent (1%) of Body Armor Products.

81.     Even in the tragic but relatively few times that Body Armor Products have been used by mass-shooters, "The Violence Project database doesn't show a clear correlation with body armor and the number of victims." Whitehurst, Johson, and Anderson, *Buffalo is latest mass shooting by gunman wearing body armor*, Associated Press, May 6, 2022, available at:

https://apnews.com/article/mass-shootings-buffalo-body-armor-f7789ba97dee4d786ac24ec5c642b7ca.

82.     There is no statistical data to suggest that Body Armor Products are disproportionately used in crimes other than mass-shootings or that the owners of Body Armor Products are not typically law-abiding Americans using the products for lawful purposes.

83.     In light of the foregoing statistics, Body Armor Products are demonstrably in common use by law-abiding Americans for lawful purposes and are not dangerous or unusual.

*The Challenged Regulations*

84.     On June 6, 2022, New York Governor Kathy Hochul signed into law restrictions on the purchase, sale, exchange, and transfer of bullet-proof vests (then defined as "body vests"). In her signing statement, Governor Hochul stated that the law "bans body armor sales outside of people in select professions[.]" Governor Kathy Hochul, *Governor Hochul Signs Landmark Legislative Package to Strengthen Gun Laws and Protect New Yorkers*, accessible at: https://www.governor.ny.gov/news/governor-hochul-signs-landmark-legislative-package-strengthen-gun-laws-and-protect-new-yorkers.

85.     Less than a month later on July 1, 2022, Governor Hochul signed legislation that expanded the scope of these restrictions from applying only to "body vests" to applying more broadly to all "body armor."

86.     These restrictions (the Challenged Regulations), which went into effect on July 6, 2022, prohibit persons other than those in certain "eligible professions" from purchasing or acquiring any kind of body armor and prohibit the sale or transfer of any kind of body armor to persons other than "eligible professions."

87.     All of the Challenged Regulations incorporate the definition of "body armor" found in N.Y. Penal § 270.20(2), which defines "body armor" as "any product that is a personal protective body covering intended to protect against gunfire, regardless of whether such product is to be worn alone or is sold as a complement to another product or garment."

88.     Plaintiff's Body Armor Products constitute "body armor" within the meaning of N.Y. Penal § 270.20(2) because they are "personal protective body covering[s] intended to protect against gunfire[.]"

89.     Body Armor Products manufactured and sold by other companies constitute

"body armor" within the meaning of N.Y. Penal § 270.20(2) because they are "personal

protective body covering[s] intended to protect against gunfire[.]"

90.     N.Y. Gen. Bus. §396-eee provides as follows:

1.  No person, firm or corporation shall sell or deliver body armor
    to any individual or entity not engaged or employed in an
    eligible profession, and except as provided in subdivision two
    of this section, no such sale or delivery shall be permitted
    unless the transferee meets in person with the transferor to
    accomplish such sale or delivery.
2.  The provisions of subdivision one of this section regarding in
    person sale or delivery shall not apply to purchases made by
    federal, state, or local government agencies for the purpose of
    furnishing such body armor to employees in eligible
    professions.
3.  For the purposes of this section, "body armor" shall have the
    same meaning as defined in subdivision two of section 270.20
    of the penal law.
4.  Any person, firm or corporation that violate the provisions of
    this section shall be guilty of a violation punishable by a fine in
    an amount not to exceed five thousand dollars for the first
    offense and in an amount not to exceed ten thousand dollars for
    any subsequent offense.

91.     N.Y. Penal § 270.21 defines the offense of "Unlawful purchase of body armor" as

follows:

A person is guilty of the unlawful purchase of body armor when,
not being engaged or employed in an eligible profession, they
knowingly purchase or take possession of body armor, as such
term is defined in subdivision two of section 270.20 of this article.
This section shall not apply to individuals or entities engaged or
employed in eligible professions, which shall include police
officers as defined in section 1.20 of the criminal procedure law,
peace officers as defined in section 2.10 of the criminal procedure
law, persons in military service in the state of New York or military
or other service for the United States, and such other professions
designated by the department of state in accordance with section
one hundred forty-four-a of the executive law. Unlawful purchase
of body armor is a class A misdemeanor for a first offense and a
class E felony for any subsequent offense.

92.     N.Y Penal § 270.22 defines the offense of "Unlawful sale of body armor" as follows:

> A person is guilty of the unlawful sale of body armor when they sell, exchange, give or dispose of body armor, as such term is defined in subdivision two of section 270.20 of this article, to an individual whom they know or reasonably should have known is not engaged or employed in an eligible profession, as such term is defined in section 270.21 of this article. Unlawful sale of body armor is a class A misdemeanor for the first offense and a class E felony for any subsequent offense.

93.     Under New York law, a "sale" of goods (including Body Armor Products) does not require a transfer of possession, but only of title. *See* N.Y. Cons. Laws, UCC § 2-106(1) ("A 'sale' consists in the passing of title from the seller to the buyer for a price"); N.Y. Comp. Codes R. & Regs. Tit. 20 § 526.7(a)(1) ("The words *sale, selling* or *purchase* mean any transaction in which there is a transfer of title or possession, or both, of tangible personal property for a consideration"). The phrase "dispose of" means "to dispose of, give, give away, lease, loan, keep for sale, offer, offer for sale, sell, transfer and otherwise dispose of." N.Y. Penal § 265.00(6). Under these definitions, the Challenged Regulations outlaw the mere offering of Body Armor Products for sale to ineligible persons, and a "sale" (or the mere offering thereof) can occur apart from the purchaser taking physcial possession, even when a purchaser is ordering the Body Armor Products online through the website of an out-of-state seller.

94.     Under New York law, "possession" of an item is not merely a function of having the item in one's physical possession, but also includes "otherwise [ . . .] exercis[ing] dominion or control over tangible property." Penal Law § 10.00(8). Under this definition of "possession," a person can constructively "take possession of body armor" by merely driving a friend or family member's vehicle that contains body armor, or possessing the keys to a home or storage unit in

24

which body armor is stored. *See People v Manini*, 79 NY2d 561, 573 (1992) (Observing that a defendant may constructively possess drugs by exercising dominion and control over them through his authority over the person who physically possesses them, or through his access to or control over the place where they are kept); *People v. Tirado*, 38 N.Y.2d 955 (1976) (sustaining a conviction for possession of narcotics even though the defendant was in Puerto Rico at the time his apartment in Manhattan was raided).

95.    N.Y. Exec. § 144-a provides as follows:

> The secretary of state in consultation with the division of criminal justice services, the division of homeland security and emergency services, the department of corrections and community supervision, the division of the state police, and the office of general services shall promulgate rules and regulations to establish criteria for eligible professions requiring the use of body armor, as such term is defined in subdivision two of section 270.20 of the penal law. Such professions shall include those in which the duties may expose the individual to serious physical injury that may be prevented or mitigated by the wearing of body armor. Such rules and regulations shall also include a process by which an individual or entity may request that the profession in which they engage be added to the list of eligible professions, a process by which the department shall approve such professions, and a process by which individuals and entities may present proof of engagement in eligible professions when purchasing body armor.

96.    Pursuant to N.Y. Exec. § 144-a, the New York Secretary of State (Defendant Mosley) has promulgated regulations outlining the criteria for eligible professions requiring the use of body armor, the process for requesting the addition of additional profession to the list of eligible professions, the process for the New York Department of State to determine eligible professions, and the process for presenting proof of engagement in an eligible profession.

97.    19 NYCRR § 905.5 provides as follows:

> A profession shall be deemed eligible by the department if the duties of the profession may expose an individual engaged in such profession to serious physical injury that may be prevented or

mitigated by the wearing of body armor, or if the duties of the profession are necessary to facilitate the lawful purchase, sale, or use of body armor.

98.    The Department of State regulations state that the definition of "eligible profession" specifically *excludes* "members of the unorganized militia" 19 NYCRR § 905.1(d).

99.    Under New York law, the "unorganized militia":

consist[s] of all able-bodied male residents of the state between the ages of seventeen and forty-five who are not serving in any force of the organized militia or who are not on the state reserve list or the state retired list and who are or who have declared their intention to become citizens of the United States, subject, however, to such exemptions from military duty as are created by the laws of the United States.

N.Y. Mil. § 2(2).

100.    In addition to being subject to draft in the event of a militia call by the United States (N.Y. Mil. § 5) members of the "unorganized militia" are subject to draft by New York's governor "in case of invasion, disaster, insurrection, riot, breach of the peace or imminent danger thereof." N.Y. Mil. § 7. Indeed, it is a punishable offense for members of the "unorganized militia" to fail to appear when summoned. *See* N.Y. Mil. § 8.

101.    Despite being required to respond to risks of gunfire, shrapnel, explosion, and other physical injuries in the course of responding to "invasion, disaster, insurrect, riot, breach of the peace or imminent danger thereof," and despite being subject to legal penalties for failing to appear when summoned by the governor to respond to such dangers, members of the "unorganized militia" in New York are categorically ineligible to acquire body armor to wear as protection when facing the perils of militia service. Unless they otherwise are engaged or employed in an "eligible profession," the Challenged Regulations require members of the

"unorganized militia" in New York to either break the law by not reporting for duty or to report

for duty without sufficient personal protection against the hazards of their service.

102. While the New York Department of State has, in its promulgated regulations made

members of the "unorganized militia" categorically ineligible to acquire body armor despite their

obvious potential exposure to bodily harm in the line of duty, the Department has, pursuant to the

Challenged Regulations, recognized other "eligible professions" as being eligible to acquire body

armor. The Challenged Regulations declare the following occupations as "eligible professions":

(a) Police officers; (b) Peace officers; (c) Persons in military service in New York State or

military or other service for the United States; and (d) Such other professions designated by the

Department of State. N.Y. Penal § 270.21; 19 NYCRR §§ 905.1(d), 905.2(a).

103. The Challenged Regulations establish a process for adding additional professions

to the list of "eligible professions" who may lawfully acquire body armor. *See* 19 NYCRR §§

905.4 - 905.5. The New York Department of State's official web page providing information on

the Challenged Regulations (https://dos.ny.gov/body-armor) provides as follows:

> As described in the body armor regulations, individuals or entities
> seeking to add a profession to the List of Eligible Professions must
> submit a request to the Department of State.  Requests must be
> submitted via the CFA portal, a tool the Department has adapted to
> receive and compile requests.  Only requests submitted through
> this system will be reviewed by the Department.  If you would like
> the Department to consider more than one profession, a separate
> request must be made for each profession. The CFA portal can be
> found here: https://apps.cio.ny.gov/apps/cfa/

104. 19 NYCRR § 905.4 provides as follows:

> (a) An individual or entity engaged in a profession in New York State
> that is not on the list of eligible professions may request that the
> [New York Department of State] add such profession to the list of
> eligible professions by filing a request with the [New York
> Secretary of State] in a form and method approved by the
> department.

(b) Requests may not be submitted by any means other than those specified in this Part and must comply with the form and content requirements as published by the department.

Pursuant to this regulation, only persons engaging in a "profession" in New York State may submit a request for a determination that their profession be designated as an "eligible profession" under the Challenged Regulations. Persons who are engaged in professions outside of New York State may not submit requests for their professions to be added to the list of "eligible professions," nor may persons engaged in a profession in New York State submit a request for the addition of a profession other than their own.

105.    The Challenged Regulations only permit individuals to acquire body armor based on their engagement or employment in a "profession." The Challenged Regulations define the term "profession" as:

> any occupation or line of work referenced or included within a category in the 2018 Standard Occupation Classification Manual published by the federal Office of Management and Budget, or as otherwise described in a federal, state, or local statute or regulation.  The 2018 Standard Occupation Classification Manual published by the federal Office of Management and Budget is hereby incorporated by reference. This publication is readily available without charge from the website of the U.S. Bureau of Labor Statistics at:
> https://www.bls.gov/soc/2018/soc_2018_manual.pdf

19 NYCRR § 905.1(f).

106.    Under the definition of "profession" in the Challenged Regulations, persons who are not engaged or employed in *any* profession are categorically ineligible to acquire body armor and are categorically ineligible for recognition as a class of persons possible of being designated as an "eligible profession" under the Challenged Regulations.

107.    Under the definition of "profession" in the Challenged Regulations, persons who are engaged or employed in a profession that is not referenced or included within a category in

the 2018 Standard Occupation Classification Manual or otherwise described in a federal, state, or local statute or regulation are categorically ineligible to acquire body armor and are categorically ineligible for recognition as a class of persons possible of being designated as an "eligible profession" under the Challenged Regulations.

108.   The following categories are not "professions" within the meaning of the Challenged Regulations and are therefore categorically ineligible to acquire body armor and are also categorically ineligible for recognition as a class of persons possible of being designated as an "eligible profession":

   a.  Member of "the People" within the meaning of the Second Amendment;
   b.  Law-abiding American citizen;
   c.  Taxpayer;
   d.  Stay-at-home parent;
   e.  Retired person;
   f.  Person whose professional career is inactive for reasons other than retirement;
   g.  Disabled person unable to maintain employment in a profession;
   h.  Purchaser of Body Armor Products; and
   i.  Prospective purchaser of Body Armor Products
       .

109.   Plaintiff is not "engaged in a profession in New York State" within the meaning of the Challenged Regulations and is therefore ineligible to submit a request to the New York Secretary of State for a profession to be added to the list of "eligible professions." Alternatively, even if Plaintiff is "engaged in profession in New York State" within the meaning of the Challenged Regulations, the Challenged Regulations do not permit Plaintiff to submit a request on behalf of a profession other than its own. Therefore, the Challenged Regulations do not permit Plaintiff to file a request to add a profession to the list of "eligible professions" or to seek any administrative relief or remedy from the New York Department of State on behalf of its customers and prospective customers.

110.    19 NYCRR § 905.3 provides as follows with respect to the criteria for

determining whether a profession is an "eligible profession" under the Challenged Regulations:

> A profession shall be deemed eligible by the department if the
> duties of the profession may expose an individual engaged in such
> profession to serious physical injury that may be prevented or
> mitigated by the wearing of body armor, or if the duties of the
> profession are necessary to facilitate the lawful purchase, sale, or
> use of body armor.

### *Additional "Eligible Professions" designated by the Department of State*

111.    As of the date of this Complaint, the Department of State has designated at least

twenty-two (22) additional professions as being "eligible professions," the occupants of which

may lawfully acquire body armor.

112.    On July 6, 2022, the New York Department of State designated "armored car

guard" as an eligible profession for the purchase, sale, and use of body armor.

113.    On July 6, 2022, the New York Department of State designated "security guard"

as an eligible profession for the purchase, sale, and use of body armor.

114.    On July 6, 2022, the New York Department of State designated "firefighter" as an

eligible profession for the purchase, sale, and use of body armor.

115.    On July 6, 2022, the New York Department of State designated "emergency

medical technician" as an eligible profession for the purchase, sale, and use of body armor.

116.    On July 6, 2022, the New York Department of State designated "paramedic" as an

eligible profession for the purchase, sale, and use of body armor.

117.    On July 6, 2022, the New York Department of State designated "ambulance driver

and attendant" as an eligible profession for the purchase, sale, and use of body armor.

118.    On July 6, 2022, the New York Department of State designated "firearms dealer"

as an eligible profession for the purchase, sale, and use of body armor.

119.     On July 6, 2022, the New York Department of State designated "body armor retailer/salesperson" as an eligible profession for the purchase, sale, and use of body armor.

120.     On August 3, 2022, the New York Department of State designated "private investigator" as an eligible profession for the purchase, sale, and use of body armor.

121.     On September 21, 2022, the New York Department of State designated "building safety inspector" as an eligible profession for the purchase, sale, and use of body armor.

122.     On September 21, 2022, the New York Department of State designated "code enforcement officer" as an eligible profession for the purchase, sale, and use of body armor.

123.     On January 13, 2023, the New York Department of State designated "firearms instructor" as an eligible profession for the purchase, sale, and use of body armor.

124.     On January 13, 2023, the New York Department of State designated "professional journalist" as an eligible profession for the purchase, sale, and use of body armor.

125.     On January 13, 2023, the New York Department of State designated "newscaster" as an eligible profession for the purchase, sale, and use of body armor.

126.     On January 13, 2023, the New York Department of State designated "nuclear security officer" as an eligible profession for the purchase, sale, and use of body armor.

127.     On January 13, 2023, the New York Department of State designated "process server" as an eligible profession for the purchase, sale, and use of body armor.

128.     On May 4, 2023, the New York Department of State designated "animal control officer" as an eligible profession for the purchase, sale, and use of body armor.

129.     On May 4, 2023, the New York Department of State designated "federal firearms dealer" as an eligible profession for the purchase, sale, and use of body armor.

130.     On December 22, 2023, the New York Department of State designated "range safety officer" as an eligible profession for the purchase, sale, and use of body armor.

131.     On December 22, 2023, the New York Department of State designated "forensic science technician, ballistics examiner" as an eligible profession for the purchase, sale, and use of body armor.

132.     On December 22, 2023, the New York Department of State designated "school building administrator and school district administrator" as an eligible profession for the purchase, sale, and use of body armor.

133.     True and accurate copies of the New York Department of State's written determinations for each of the foregoing additional eligible professions are linked and accessible on the State of New York's official website for the Challenged Regulations: https://dos.ny.gov/body-armor. Each of these written determinations are incorporated by reference herein.

134.     For each of the foregoing "eligible professions" the New York Department of State determined that each profession "*sometimes* requires individuals engaged or employed in that profession to put themselves in dangerous situations that may expose them to serious physical injury, and that such serious physical injury may be prevented or mitigated by the wearing of body armor." (emphasis added).

135.     Upon information and belief, the New York Department of State has denied and/or rejected applications for certain professions to be determined to be "eligible professions" under the Challenged Regulations.

*Absurdities of the Challenged Regulations*

136.     Neither the Challenged Regulations, nor any other New York law requires persons "engaged or employed in an eligible profession" to undergo a background check to lawfully purchase or acquire body armor. Persons "engaged or employed in an eligible profession" may lawfully purchase body armor even if they are mentally ill, subject to civil restraining orders, or have an extensive criminal record.

137.     Meanwhile, New Yorkers who are *not* "engaged or employed in an eligible profession" may *not* acquire body armor of *any* kind, even if they are law-abiding, virtuous, and responsible citizens with good moral character and no record of violence. For example, combat veterans, judges, retired police officers, victims of domestic violence, are ineligible to purchase or acquire *any* body armor for self-defense or any other lawful purpose.

138.     The criteria for being eligible to lawfully acquire body armor under the Challenged Regulations is not an individualized assessment. Unlike New York's pre-*Bruen* "proper-cause" regime for obtaining a permit to carry a firearm, an individual's eligibility to lawfully acquire body armor under the Challenged Regulations is not based on *that individual's* demonstrated need to possess body because of their *personal* risk of exposure to bodily injury. Rather, a person may lawfully acquire body armor regardless of their personal risk exposure, so long as they are "engaged or employed in an eligible profession."

139.     For example, a "professional journalist" who works entirely from the safety and comfort of the home-studio in his luxury chalet in a gated shoreside community on Lake George may exploit his privileged profession to lawfully acquire a steel-plate carrier bundle solely to use as a weighted vest for purposes of physical exercise. But a taxi driver in Brooklyn is prohibited

from acquiring one of Plaintiff's concealed armor carriers to wear for protection on her drives on some of America's most dangerous streets.

140.     Under the Challenged Regulations, a full-time student at Columbia University who wishes to purchase an armored backpack to wear during periods of unrest on campus is prohibited from doing so. But a "process server" may lawfully acquire an armored backpack to carry subpoenas and summonses in.

141.     The teachers and students in New York's high schools may not acquire Plaintiff's armored backpacks for their protection after their school received a bomb threat, but the building and district administrators of such schools may lawfully acquire *any* kind of body armor for their own personal recreational purposes.

142.     Under the Challenged Regulations, even if an individual is "engaged or employed in an eligible profession," their ability to lawfully acquire body armor in New York ends if they cease being in an "eligible profession," by means of termination, career change, disability, or retirement, be it voluntary or involuntary. Therefore, even persons who are "employed or engaged in an eligible profession" have their rights infringed by the Challenged Regulations.

143.     During the recent trial of former President Donald Trump in Manhattan, witness Stephanie Cliffor (a.k.a. Stormy Daniels), who was concerned for her security and "what some nut might do to her" for speaking out with her story, wore body armor under her clothes while giving her testimony on the witness stand in the courtroom. Filip Timotija, *Lawyer says Stormy Daniels wore bulletproof vest to testify in Trump trial*, The Hill, May 14, 2024, available at: https://thehill.com/regulation/court-battles/4662385-stormy-daniels-bulletproof-vest-donald-trump-hush-money-trial/. The Challenged Regulations prohibit women like Ms. Clifford who

fear for their security from being able to acquire body armor, thereby discouraging them from speaking out when there is a risk of retaliation.

144.    Individuals who are not "employed or engaged in an eligible profession" within the meaning of the Challenged Regulations constitute at least a majority of New York residents.

145.    Individuals who are not "employed or engaged in an eligible profession" within the meaning of the Challenged Regulations constitute at least a majority of Plaintiff's customers and prospective customers in the State of New York.

146.    Under the Challenged Regulations, when a lawful possessor of body armor becomes deceased, his or her spouse, children, or heirs cannot lawfully take possession of any Body Armor Products in the deceased possessor's estate. Moreover, a lawful possessor of body armor may not devise through a testamentary instrument their Body Armor Products to their spouse, children, or heirs.

### *Restrictions on the sale and delivery of body armor under the Challenged Regulations*

147.    In addition to criminalizing the purchase or acquisition of body armor by individuals who are not "engaged or employed in an eligible profession," the Challenged Regulations also criminalize the sale or delivery of body armor to such individuals. *See* N.Y. Gen. Bus. §396-eee; N.Y. Penal § 270.22.

148.    These prohibitions on the sale and delivery of body armor are unconstitutional in their own right. They infringe on the rights of New Yorkers by outlawing the sale of body armor to non-eligible persons, thereby making the acquisition of body armor legally impossible for such persons in New York.

149. The Challenged Regulations further impose a requirement that a transferor of body armor must meet in person with a transferee to transfer the body armor. *See* N.Y Gen. Bus. § 396-eee; 19 NYCRR § 905.6.

150. The regulations further require that at an in-person transfer of body armor, any individual or entity purchasing or taking possession of the body armor must "present proof of engagement in an eligible profession[.]" 19 NYCRR § 905.6(a). The Challenged Regulations provide that:

> Proof of engagement in an eligible profession may be satisfied by submission to the seller of a professional license issued by a federal, state or local government; employment card or other credential issued by an employer, or in the absence of the foregoing, submission to the seller of a form approved by the Department of State that is notarized, verifying that the purchaser is engaged in an eligible profession.

19 NYCRR § 905.6(b). The forms approved by the New York Department of State for use as proof of engagement in an eligible profession are available at: https://dos.ny.gov/body-armor.

151. Like the Challenged Regulations' restrictions on who may be eligible to acquire body armor, the in-person transfer requirements have absurdly unconstitutional implications. For example, out-of-state body armor sellers cannot ship their products directly to New York purchasers or to their New York retail distributors, therefore New York residents must travel out of state to even acquire the body armor. Even an intra-state body armor transaction (e.g. a Buffalo seller and a Montauk buyer) is rendered unduly burdensome by this in-person transfer requirement.

152. New York does not impose a similar in-person transfer requirement for the sale of firearms. Under New York law, firearm purchasers may make arrangements with an out-of-state or otherwise distant seller to ship the firearm to the buyer's local Federal Firearms License (FFL)

dealer, and the FFL dealer will facilitate the transaction to effectuate the lawful transfer of the firearm to the buyer. Neither the seller nor the buyer is required to travel out of their local area to transfer the firearm. *See* N.Y. Gen Bus § 898; *see also* New York State, *Resources for Gun Dealers,* available at: https://gunsafety.ny.gov/resources-gun-dealers.

153.    Under the in-person transfer requirement imposed by the Challenged Regulations, body armor is more onerous to acquire than a firearm, even for persons "engaged or employed in an eligible profession."

154.    The in-person transfer requirement is not consistent with this Nation's history and tradition of arms regulation.

155.    Even if the in-person transfer requirement could pass constitutional muster in a vacuum, it is inseverable from the unconstitutional "eligible profession" requirement since the purpose of the in-person transfer is to facilitate the requirement that a purchaser of body armor "present proof of engagement in an eligible profession when purchasing or taking possession of body armor." 19 NYCRR § 905.6.

***Injury to Plaintiff's New York customers and prospective customers***

156.    In the years leading up to the implementation of the Challenged Regulations, Plaintiff had customers in New York State who purchased Body Armor Products.

157.    Since the implementation of the Challenged Regulations, Plaintiff continues to have prospective customers in New York (including in this District and including in Nassua and Queens County) who may wish to purchase Body Armor Products for lawful purposes in New York (including in this District and including in Nassua and Queens County), but who are unable to do so because of the Challenged Regulations.

158.    Before the Challenged Regulations went into effect, New York residents purchased Body Armor Products from Plaintiff by ordering them online.

159.    Since the Challenged Regulations went into effect, Plaintiff has received substantially fewer orders for Body Armor Products from New York residents.

160.    Plaintiff's customers and prospective customers in New York who are not "engaged or employed in an eligible profession" have been injured by the Challenged Regulations, which render them unable to acquire any Body Armor Products.

161.    Plaintiff's New York customers and prospective customers have suffered, or are at substantial risk of suffering, an injury in fact by virtue of a credible threat of enforcement of the Challenged Regulations against them.

162.    Upon information and belief, with respect to violations and suspected violations of the Challenged Regulations, law enforcement officers with the New York State Police have conducted investigations, made arrests, executed warrants, and/or otherwise enforced the Challenged Regulations.

163.    Upon information and belief, with respect to violations and suspected violations of the Challenged Regulations, law enforcement officers with the New York State Police intend to conduct investigations, make arrests, execute warrants, and/or otherwise enforce the Challenged Regulations.

164.    Upon information and belief, with respect to violations and suspected violations of the Challenged Regulations, Defendant James intends to enforce the Challenged Regulations in his capacity as acting Superintendent of New York State Police.

165.    Upon information and belief, with respect to violations and suspected violations of the Challenged Regulations, prosecutors with the Nassau County District Attorney's Office

(including Defendant Donnelly) have conducted investigations, sought warrants, sought indictments, charged suspected offenders, prosecuted suspected offenders, and/or otherwise enforced the Challenged Regulations.

166.    Upon information and belief, with respect to violations and suspected violations of the Challenged Regulations, prosecutors with the Queens County District Attorney's Office (including Defendant Katz) have conducted investigations, sought warrants, sought indictments, charged suspected offenders, prosecuted suspected offenders, and/or otherwise enforced the Challenged Regulations.

167.    Upon information and belief, with respect to violations and suspected violations of the Challenged Regulations, Defendants Donnelly and Katz intend, in their capacities as District Attorneys for their respective districts, to conduct investigations, seek warrants, seek indictments, charge suspected offenders, prosecute suspected offenders, and/or otherwise enforce the Challenged Regulations.

168.    Plaintiff's customers and prospective customers in New York who are "engaged or employed in an eligible profession" have been injured by the Challenged Regulations, which require them to meet in-person with out-of-state and otherwise distant body armor sellers to effectuate a lawful purchase of body armor.

169.    But for the Challenged Regulations, Plaintiff's customers and prospective customers in New York would be able to acquire body armor for self-defense.

170.    Declaratory and/or injunctive relief as requested below would address the injuries suffered by Plaintiff's New York customers and prospective customers.

*Summary of the Unconstitutionality of the Challenged Regulations*

171.    The provisions of the Challenged Regulations that prohibit the acquisition of body armor by persons not "engaged or employed in an eligible profession" (N.Y. Penal § 270.21; 19 NYCRR § 906.5) violate the Second Amendment because they prevent law-abiding American citizens from acquiring arms based on their profession, a prohibition for which there is no historical analogue in this Nation's tradition of arms regulation.

172.    The provisions of the Challenged Regulations that prohibit the sale or delivery of body armor to persons not "engaged or employed in an eligible profession" (N.Y. Gen. Bus. §396-eee; N.Y. Penal § 270.22; 19 NYCRR § 906.5) violate the Second Amendment because they prevent the sale of arms to law-abiding American citizens based on the profession of the purchaser, a prohibition for which there is no historical analogue in this Nation's tradition of arms regulation.

173.    The provisions of the Challenged Regulations that establish criteria and processes for determining "eligible professions" that may acquire body armor (N.Y. Exec. § 144-a; 19 NYCRR §§ 905.1 – 905.5) violate the Second Amendment because they expressly exclude from eligibility entire classes of persons from being able to acquire body armor or even to apply for eligibility, a prohibition for which there is no historical analogue in this Nation's tradition of arms regulation.

174.    The provisions in the Challenged Regulations that require an in-person transfer of body armor (N.Y. Gen. Bus. §396-eee; 19 NYCRR §§ 905.6) violate the Second Amendment because they have the effect of eliminating the ability of law-abiding, responsible citizens to acquire body armor. *See Gazzola*, 88 F.4th at 196 ("[C]ommercial regulations on firearms dealers, whose services are necessary to a citizen's effective exercise of Second Amendment

rights, cannot have the effect of eliminating the ability of law-abiding, responsible citizens to acquire firearms").

175.    All of these aspects of the Challenged Regulations (prohibitions on acquisition, prohibitions on sale, eligible profession determination, and in-person transfer requirement) are inseverable from one another because they are all part of one coherent policy to prohibit the acquisition of body armor to all but those who are in eligible professions.  *See Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 194 (1999) ("[E]mbodying as it did one coherent policy, [the entire order] is inseverable").

176.    Federal law and the law of some states outlaws the possession of body armor by violent felons but provides exemptions for such felons who need body armor for their profession.[3] But the Challenged Regulations treat ***everyone*** as a violent felon and allows only certain privileged professions to acquire body armor based on the Secretary of State's determination that those professions have a special need for it. Like New York's carry license regime that was invalidated in *Bruen*, the Challenged Regulations permit New Yorkers to acquire arms "only after demonstrating to government officers some special need." 597 U.S. at 70. Therefore, like the regulations that were struck down in Bruen, the Challenged Regulations "violate[] the Fourteenth Amendment in that [they] prevent[] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id*., at 71.

---

[3] *See, e.g.*, 18 U.S.C. § 931; Md. Criminal Law Code § 4-107; MCL § 750.227g; Tex. Penal Code § 46.041; Cal. Pen. Code § 31360; Wis. Stat. § 941.291; A.C.A. § 5-79-101.

**CLAIM FOR RELIEF – 42 U.S.C. § 1983 – INFRINGEMENT OF THE RIGHT TO KEEP AND BEAR ARMS UNDER THE SECOND AND FOURTEENTH AMENDMENTS**

177.　The foregoing allegations are repeated and re-alleged as if fully set forth herein.

178.　Each of the Defendants act and have at all times relevant acted "under color of State law" within the meaning of 42 U.S.C. § 1983.

179.　Plaintiff's customers and prospective customers in the State of New York are part of "the People" within the meaning of the Second Amendment.

180.　Body Armor Products are "arms" within the meaning of the Second Amendment.

181.　Body Armor Products are in common use for self-defense.

182.　The people who purchase and possess Body Armor Products are typically law-abiding American citizens.

183.　The purposes for which Body Armor Products are typically purchased or possessed are lawful ones.

184.　The Challenged Regulations infringe on the Second Amendment rights of Plaintiffs' customers and prospective customers by prohibiting them from acquiring body armor.

185.　The Challenged Regulations infringe on the Second Amendment rights of Plaintiff's customers and prospective customers by imposing unduly burdensome in-person transfer requirements on the acquisition of body armor.

186.　The Challenged Regulations are not consistent with this Nation's history of arms regulation.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

1.      A declaratory judgment under 28 U.S.C. § 2201 that the Challenged Regulations infringe upon the rights of Plaintiff's New York customers to keep and bear arms protected under the Second and Fourteenth Amendments to the United States Constitution and are thus devoid of any legal force or effect;

2.      Injunctive relief restraining Defendant Mosley (as well as his officers, agents, servants, employees, and all persons in concert or participation with him who receive notice of the injunction) from making, promulgating, or enforcing any rules, regulations, or determinations that prohibit or restrict any law-abiding citizens or class thereof from being able to acquire body armor for lawful purposes;

3.      Injunctive relief restraining each of the Defendants and their respective officers, agents, servants, employees, and all persons in concert or participation with them who receive notice of the injunction from enforcing the Challenged Regulations;

4.      Plaintiff's attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable law; and

5.      Any other relief that the Court deems just and appropriate.

DATED: June 17, 2024

Respectfully submitted,

*/s/ Joseph B. Brown*
Joseph B. Brown
In-House Counsel
Armored Republic Holdings, LLC
17431 N Black Canyon Highway
Phoenix, AZ 85023
jbrown@armoredrepublic.com
*Admission pro hac vice to be filed\**